## 17455

Svilla WILLIAMS and W. R. BURGESS, Administrators of the Estate of Miller Williams, Appellants, v. Carl J. FORD et al., Respondents

(104 S. E. (2d) 378)

*James Hugh McFaddin, Esq.,* of Manning, *for Appellants,*

*Messrs. John G. Dinkins,* of Manning, and *Edens & Woodward,* of Columbia, *for Respondents,*

July 20, 1958.

LEGGE, Justice.

Action for alleged wrongful death of plaintiff's intestate who, walking on a highway about 1:30 a. m. on February 11, 1955, was struck and killed by a truck. The defendants Carl J. Ford, Connie Mack Ford and A. J. Ford, copartners trading as Ford Produce Company, with their principal office at Raleigh, North Carolina, were the owners of the truck. The defendant G. F. Dowd, their employee, was driving it, en route from Sanford, Florida, to Raleigh.

Defendants' motion, at the close of all of the evidence, for direction of verdict, was denied, and the case was submitted to the jury, which found for the plaintiff five thousand ($5,-000.00) dollars actual damages. Thereafter, on defendants' motion for judgment *n. o. v.*, the trial judge set the verdict aside and ordered judgment for the defendants upon the following grounds:

1. That negligence on the part of the driver of the truck could not reasonably be inferred from the evidence; and

2. That if the evidence could be viewed as supporting the allegations of negligence on the driver's part, then the only reasonable inference that could be drawn from all of the evidence was that the death of plaintiff's intestate resulted from his own contributory negligence.

Appeal from that order necessitates review of the evidence bearing on the accident. That on the part of the plaintiff was wholly circumstantial, the substance of it being as follows:

Miller Williams, the decedent, a colored man about fifty-four years of age, was employed as a handyman, and lived, on the farm of Mr. Hodge on U. S. Highway 15, two miles north of Paxville. Thomas Harvin, who also worked on Mr. Hodge's farm, and whose residence was some 75 or 80 yards north of Mr. Hodge's testified that he and Williams finished work about dusk on the afternoon of February 10; and that was the last time he saw Williams until after the accident, which occurred on the highway at a point about 50 or 75 yards from Harvin's house. When they separated at the end of their day's work, Williams had told Harvin that he was going to the home of Cassie Perry, near Paxville. Harvin testified that he went to the scene of the accident shortly after it happened, which was, as before stated, about 1:30 a. m. on February 11. He did not say, nor does the evidence otherwise disclose, how his attention had been called to the accident. He testified that when he arrived at the scent Williams' body was lying in the west lane (*i. e.,* left of the center line, from the standpoint of northbound traffic) of the pavement, about two or three feet from the dirt shoulder; that a car was parked on the dirt shoulder on the right (east) side of the highway; that there were tire marks on the left side of the pavement; and that between the parked car and the body of Williams there was room enough for a truck to pass through. He testified also that the defendants' truck and another truck were at the scene, but he did not specify their exact location. State Highway Patrolman McElhaney, who investigated the accident, testified:

The accident occurred on U. S. Highway 15 about a mile and a half north of Paxville. When he arrived at the scene the body of Williams was on the pavement, approximately four feet from its left edge going north. This highway is in most places twenty-four feet wide, but he did not know its width at the point in question; it is straight and level in both directions from this point. It had rained earlier in the night, and the road was still wet, but it was not raining when the witness was there. He found tire marks, forty feet in length,

on the left (west) side of the road; but he could not say whether they were brake marks or skid marks, nor could he recall whether they were straight or curved. Upon his memory being refreshed from the transcript of his testimony at the coroner's inquest, he recalled that the marks on the road from their starting point were of "one wheel on each side of the center line." In the left lane he found some "blood and marks, also the pedestrian's hat and some change", but nothing to indicate that the man had been struck in the right lane. He saw the defendants' truck, which was then parked on the right side of the pavement, headed north; he found a "mashed-in-place" on one of its fenders, but was not sure which fender. The driver of the truck admitted that he had run into Williams. The accident did not occur at an intersection or at a marked cross-walk. At some distance, there was a house on each side of the road, their driveways entering the highway several hundred yards from the place of the accident.

Louis Richburg, driver for Samuels Funeral Home, testified that he went to the scene of the accident to bring Williams' body in. He arrived ahead of the highway patrolman, and covered the body, which was about two feet from the left (west) edge of the pavement.

N. R. Blackwell, the embalmer, testified that examination of Williams' body disclosed that the neck, both legs, and right arm had been broken.

The foregoing is all of the evidence offered by the plaintiff on the issue of the defendants' negligence. Following is the substance of the evidence on the part of the defendants:

One Eddie Davis testified: that Williams had been with him on the night of February 10 from "first night" until around 10:00 or 10:30 p. m.; that they had together gone to a place near the Sumter County line; that they had found some liquor in the woods; that both of them had been drinking a little, but neither of them was drunk. From the place near the county line he took Williams to Cassie Perry's house, where he left him; and when Williams got out of the car he, Davis, went on home.

Cassie Perry testified: that her house is about half a mile from Paxville; that she saw Williams on the night in question "directly after first dark"; and again at between 10:00 and 11:00 p. m., when he came back in company with Eddie Davis, who put him out in her yard; that she was having a prayer meeting in her house that night, and Williams didn't come in "because he and Ned had been off"; that he didn't stay in the yard long; and that when he left he was walking "just as good as anyone." She did not state what direction Williams took when he left; and his whereabouts from the time of his departure, about 11:00 p. m., until the time of the accident, is not revealed by any of the testimony.

The defendants produced the testimony of three eyewitnesses to the accident, towit: G. F. Dowd, the driver of the truck; John F. Findley, a stranger; and Norman B. Pyle, an acquaintance of Dowd, who was driving another truck behind Dowd, but who had no business connection with the defendants.

The substance of Dowd's testimony was as follows:

He was making a trip from Sanford, Florida, to Raleigh, North Carolina; his truck, a 1950 Mack, weighed 25,000 lbs., and its load 30,000 lbs.; he was alone, had left Sanford about 2:00 o'clock on the afternoon of February 10, and his last stop before the accident was at Skipper's Truck Stop in Summerton, South Carolina (nine miles south of Paxville), where he had remained about an hour. He testified that from Summerton he had been following an automobile; that a mile and a half beyond Paxville, when he was about 200 or 250 yards behind the automobile, its brake lights went on and it pulled partly off the road to the right shoulder, part of its rear end being still on the pavement; that his speed was about fifty miles an hour; that he pulled over to the left to pass, without reducing his speed, the left lane being clear; that as the truck was about to pass the car a man staggered across the road sideways, with his back toward the oncoming truck; that in an effort to avoid hitting the man he put on brakes and pulled as hard as he

could to the left; that the right front fender of the truck struck the man, about two feet left of the center line; that by the time he stopped the truck it was on the left shoulder, that he then pulled the truck over to the right of the road; that his skid marks began at the center line and continued across to the left shoulder; that he must have let up on his brakes when he hit the shoulder, as he was then about to turn over; that the speed limit at the place of the accident was fifty-five miles per hour; that when he first saw Williams he (Williams) was about in the center of the road; and that as soon as he saw Williams he applied his brakes, and the brakes were on when Williams was struck.

John F. Findley, whose past employment included that of peace officer, prison guard, and investigator for an alcohol tax unit, and who knew none of the parties to the action, testified that he was driving from Savannah, Georgia, to Fayetteville, North Carolina; that a truck which later proved to be that of the defendants, had been following him from about Summerton; that as he (Findley) was about a mile and a half north of Paxville, he saw, about 75 feet ahead of him, a man staggering in the center of the road, and that he (Findley) went off to the right and off the road to avoid hitting him. When asked if he meant that the man was staggering in the middle of the northbound lane or in the middle of the road, he said: "In the middle of my lane and then he staggered on into the center of the road and this truck came around me and hit him. He walked into the truck." He also testified that Williams was wearing dark blue coveralls and a blue denim coat; that he (Findley) had been driving about fifty miles an hour and that the truck had not been gaining on him; that he actually saw the truck hit Williams, the point of impact being on the right-hand fender; that at the time he was struck Williams was about in the middle of the road; that the driver of the truck cut sharply to the left to avoid hitting Williams; and that at that time he (Findley) was already stopped, with part of his automobile on the shoulder and about two feet of its rear portion on the pavement.

Norman B. Pyle, of Raleigh, N. C., testified as follows:

He was employed as truck driver by Beasley Produce Company; he had never worked for Ford Produce Company; he had known Dowd for many years. On the night of the accident his truck and Dowd's which had been running together from the Florida-Georgia line, stopped at Skipper's Truck Stop, about half a mile south of Summerton. After they left Skipper's, Pyle's truck was following Dowd's; and when the accident happened Pyle's truck was about a city block behind Dowd's. Pyle saw an automobile go to the right, and Dowd's truck go to the left and "cut right short". Pyle threw his bright lights on and saw something "stagger out and cross the road"; he didn't know at the moment whether or not it was a man; he could not state just where in the road the decedent was when the truck hit him; when he got to the scene decedent's body was in the roadway about two feet from the center line.

To warrant a conclusion sought to be established in a civil case by circumstantial evidence, the facts and circumstances disclosed by such evidence must be such as, considered in the light of ordinary experience, would lead with reasonable certainty to such conclusion, and not leave it to mere speculation or conjecture. *Leek v. New South Express Lines,* 192 S. C. 527, 7 S. E. (2d) 459; *Attaway v. One Chevrolet 5-P Truck,* 228 S. C. 559, 91 S. E. (2d) 270.

The conclusion thus sought to be established here was, under the allegations of the complaint, that the decedent, while walking in a northerly direction on the left side or left shoulder of the highway, facing southbound traffic as required by law for pedestrians, had been negligently and recklessly run down from the rear by the defendants' truck, which was on its wrong side of the road. In support of that conclusion the plaintiff, of necessity, relied solely upon the physical evidence found on the highway immediately or very shortly after the accident. That evidence was perfectly consistent with the direct, uncontradicted and

unimpeached testimony of the defendants' eyewitnesses. We agree with the trial judge that it failed to meet the probative requirements before mentioned.

> "A fact cannot be established by circumstances which ■ is perfectly consistent with direct, uncontradicted, and unimpeached testimony that the fact does not exist." 32 C. J. S., Evidence, § 1039, p. 1101; 20 Am. Jur., Evidence, Section 1189, p. 1043; *Esso Standard Oil Co. v. Stewart*, 190 Va. 949, 59 S. E. (2d) 67, 18 A. L. R. (2d) 1319; *City of Summerville v. Sellers,* 94 Ga. App. 152, 94 S. E. (2d) 69.

The plaintiff's case is not strengthened by anything in the evidence for the defendants. That evidence showed that Dowd's speed was below the posted limit; that the hour was was past midnight; that the road was straight and level, its left lane was clear, and there was no intersection or pedestrain cross-walk near; and that when he saw, some 200 yards ahead, the brake lights appear on Findley's automobile and that automobile pull off to the right of the road, he drove far enough to the left to pass it with safety. Negligence cannot reasonably be inferred from the fact that he did not reduce his speed at that time; under the conditions described he was under no duty to do so. When he was about to pass the stopped automobile, Williams, who was dressed in dark clothes, and who had narrowly escaped being struck by Findley's car, suddenly appeared in front of Dowd's truck, staggering into the middle of the road; and Dowd immediately applied his brakes and pulled as hard as he could to the left in an effort to avoid hitting him. The trial judge correctly held that this evidence was not reasonably susceptible of the inference of negligence on the part of Dowd. Cf. *Wright v. South Carolina Power Co.,* 205 S. C. 327, 31 S. E. (2d) 904; *Critzer v. Kerlin,* 231 S. C. 315, 98 S. E. (2d) 761.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.