# Wytheville

## MARY HASKER SMITH V. CITY OF RICHMOND, ETC.

June 6, 1945.

Record No. 2927.

Present, All the Justices.

The opinion states the case.

*Thomas A. Williams* and *L. C. O'Connor*, for the plaintiff in error.

*Horace H. Edwards* and *Olin A. Rogers*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

The plaintiff, Mary Hasker Smith, was overcome in her apartment by city gas. The City of Richmond makes gas and furnishes it to its people—to thousands of them.

By motion for judgment, Mrs. Smith asks compensation in damages from the City for injuries suffered. There was a jury trial. When plaintiff had completed her evidence, the City moved that it be stricken out and charged that she had not made out a case. That motion was overruled. After all of the evidence had been introduced, both that tendered on behalf of the plaintiff and that tendered on behalf of the defendant, the City renewed its motion to strike. That motion was sustained. Thereupon the jury returned a verdict in favor of the defendant. Plaintiff asked that it be set aside. Her request was denied and judgment entered for the defendant. That judgment is now before us on a writ of error.

At 7:13 on the morning of January 10, 1943, the City was notified by Mrs. Walter Kolm, who occupied an apartment immediately adjoining the plaintiff's apartment in building No. 5-7 North Boulevard, that gas was leaking into that building. The City, in response to this notice, sent Mr. Edgar Harris, an employee in the Department of Public Utilities, to that address. He reached it at 7:30, went to Mrs. Kolm's apartment, found nothing there, went to the basement and cut off all gas meters. No leaking gas was then going through them. He then knocked on the doors of several apartments and aroused their occupants. He finally reached Mrs. Smith's apartment and was let in by her husband. He found Mrs. Smith unconscious, called the rescue squad, and administered artificial respiration until that squad arrived. She was taken to a hospital and has recovered.

█ Injuries which plaintiff has suffered are ample to sustain a recovery, but that is not enough. It must be made to appear as a proximate cause that the city has done something which it ought not to have done or has left undone something which it should have done. This brings us to the evidence.

Mr. Harris said that from the basement after he had cut off the meters he could hear gas escaping.

Mrs. Smith, testifying, said that she had complained to the City three or four times about her range pilot light, which kept going out, but had no recollection of the dates of these complaints and could not say whether they were before or after the accident. Each complaint, when made, was registered by the City, and the records show conclusively that they were made after January 10, 1943. It is entirely clear that no trouble came from that source. She did say that there were fumes in her living room after the pilot light was cut off but that she did not know where they were coming from. She further said that there were bad odors about her apartment before the date of the accident but thought that they were from the DuPont Chemical Works. After her pilot light was cut off, there was no

odor in the kitchen but some in the front part of the house. In her cross-examination and in her last question she was asked:

"Q. Mrs. Smith, do you know whether this fume that you smelled before your serious injury on January 10th was gas or was it DuPont odors?

"A. I told you I did not know."

Elsewhere she said: "I thought it was an odor from outside of some chemical."

She also said:

"I told you I have always smelled the odor in the front and thought it was DuPont. It may have been DuPont, it may have been gas; I don't know what it was, but I smelled an odor."

This same odor which persisted before and after the accident in all human probability came from the DuPont plant.

Mrs. Kolm, who had lived for several years in an apartment above Mrs. Smith's, said that there was no evidence of gas before the date of the accident and that she had talked some with her neighbor, Mrs. Smith, before then, but that she had never mentioned gas.

Mr. Smith, the plaintiff's husband, did not detect any evidence of gas before the accident. He did say that his wife had complained to him of its presence, but she has not corroborated him.

Mr. West, Mrs. Smith's nephew, came into the apartment between twelve and one o'clock on the morning of the 10th and spent the night. There was then no evidence of gas, and he knew nothing about it until he was called by Mr. Smith just before the complaint was sent into the gas office.

Mrs. Reynolds, who lived in an apartment across the hall from Mrs. Smith and had lived there since 1925, during that time had detected no odor of gas in her apartment.

The City, in an effort to locate this escaping gas, uncovered its gas pipe in the apartment house yard and sawed it off two feet from the yard coping and lifted it out from this sawed-off point to the building. In this pipe, 4 or 5

feet from the wall of the house, was a coupling and at or by it was a crack, the surface of which was untarnished, thereby plainly indicating that it was of recent origin. Not only was the pipe in the yard taken out but also that which extended under the sidewalk and under the street to the gas main itself.

All of this piping was for a time left in the yard. While there Mr. Schneider, a neighbor, saw it, though he was not present at its excavation. He said that some of it was but a shell and filled with pin holes which one could see through. He was recalled and on direct examination said:

"A. Well, those little pin holes are formed from the inside out, it will eat from the inside out and form a little rust spot on there, look like a little rust spot, but if you examine closely from within you can see a hole in the center which is all the way through into the pipe, you see.

"Q. That is what you saw?

"A. Yes, sir."

On cross-examination, the court asked:

"Q. Is this what you call a pin hole?

"A. Yes, sir; that hole will go through."

Thereupon this point in the pipe was filed away. It did not go through the pipe. He was then asked:

"Q. Could you pick out some more pin holes?

"A. I wouldn't try."

The utmost that can be drawn from Mr. Schneider's testimony is that some of this gas pipe had rusted away and was comparatively worthless, but certainly it was not that part of it which was in the apartment yard; and it is equally certain that no gas escaped from this rusted pipe into the apartment building. For these defects, if they were existing at all, were of long standing, and no one claims to have detected any evidence of gas in the building until the morning of January 10th, when through the crack at the coupling gas could be heard escaping.

That phase of this evidence is discussed by Judge Miller of the trial court in a very satisfactory opinion, which is made a part of this record. He said:

"Mr. Schneider, who came down to the premises sometime after the ground had been opened and after all of the pipe had been drawn out and was lying on the sidewalk or on the edge of the premises, testified when he was on the witness stand first that all of the pipe was distinctly defective, he made no real distinction between one part and the other, and stated it was shot with pin holes and corroded and that he even looked through the holes in it. He stated that all of it was bad and that part of it was a mere shell, did not constitute any pipe at all. Upon cross examination he, to a considerable extent, abandoned that position, stated he could not recognize any of the pipe which was shown to him and that the pieces produced in the courtroom were such that he could not recognize them. Upon further examination he testified that the part not produced was worse than the part produced, but undertook to point out what he considered a pin hole which he claimed would be a leakage if some sharp point was applied to it. Application of a file to the pin hole or supposed pin hole designated by him showed that as soon as the rust had been filed from the extreme outer surface it was a distinctly solid piece of metal under it and that no leakage could come through the part designated by him as a pin hole and that nothing could be punched through it in the nature of a toothpick or anything else; in other words, that it was a solid piece of pipe at that place."

There are fifty miles of gas mains in the City, tapped by underground gas pipes for consumers more than 34,000 times. Manifestly the City could not undertake to uncover these 34,000 service pipes. They would have to dig up every yard in Richmond and then dig them up again.

What the City did was to make periodic tests, and in doing this adopted four modern scientific devices. It also instructed all men who read gas or water meters to report anything which would lead them to suspect that gas was escaping, and to every complaint made it responded promptly, as it did in the instant case.

Any verdict which the jury might have returned for the plaintiff would have been plainly wrong and without evidence to support it. We conclude this opinion with this excerpt from Judge Miller's opinion, which we adopt and approve:

"The court is not unmindful of the hardships imposed upon plaintiffs when the court acts in striking out the evidence, which thereupon necessarily results in a second trial and submission of the case to the jury if the trial court is in error, and I feel I may fairly say that I have adhered to the rule laid down in *Leath* v. *Richmond, etc., R. Co.,* in 162 Va. 705, 174 S. E. 678, and more than that, I never struck the evidence in any case until I was more than satisfied that a verdict could not stand. In other words, it must not only have to appear to me that a verdict could not stand, but insofar as I am concerned that I must to the best of my ability know that a verdict could not stand. I do not mean by that that I might not err in my conception of the law and in my recollection of the facts be mistaken, but that is the principle under which I have to view all motions to strike evidence, being fairly conscious of the distinct injustice done to the plaintiff by striking the evidence when there is any possibility of a right to go to the jury.

"From the evidence, viewed from the City's standpoint, the break in question was at the point of junction of the two pipes; that is, the place pointed out by these two or more witnesses as to where they ascertained the break to exist when the pipe was removed; hence, from that viewpoint, there is no question but that the pipe was a solid pipe and apparently good except at this particular point. The court's own view of the evidence is that it is overwhelming that the break occurred at this point and that the leakage was at this point. Viewed in that light, the court would without question or hesitation strike the plaintiff's evidence because factually and legally there could be no liability or semblance of liability upon the City.

"When the court comes to consider the evidence of the

plaintiff's witness that the whole pipe was shot with holes, it is prompted to look at it in a slightly different manner, but even then it would seem the principle of law is just the same; that even though the pipe were defective and might have been found to be defective by the removal of that pipe, that the City has still complied with all of the obligations imposed upon it and the court does not deem the rule to be that the City must unearth periodically all of its service pipes in the City of Richmond and inspect them from the outside; that is, by washing them off and ascertaining if any pin holes are in them, as such cannot be done, and if done would be fraught with more disastrous results than if it was not done because it would be obvious that the removal of the surface and going under the pipes and examination of them would cause them to break down quicker than if they had not removed them. The court viewing that on the same principle of law concludes that the City has performed its duty in the premises.

"No motion was made to strike the evidence on the ground of any contributory negligence of the plaintiff as a matter of law. Such might have been done and while the court does not now undertake to pass upon contributory negligence of the plaintiff as a matter of law, there is and would be a serious question presented as to whether the plaintiff's own conduct or lack of precaution after she ascertained gas was in the apartment would not bar her from recovery, but the court does not deem it necessary to pass upon that question as it has concluded that no actionable negligence has been made out against the City, and that is arrived at, first, on the ground that it performed its duties in regard to the inspection and maintenance of the pipe in question, that it had no notice and could not have had any notice by any means known to the corporation or to other gas companies other than unearthing without reason all of the gas pipes in the City of Richmond, including this one, and inspecting them by eye or any other methods that might be used after the pipe is unearthed.

"Lastly, if the court considered that the deterioration of the pipe held the City liable in regard to the evidence offered by the plaintiff's witness just referred to, the court would be bound to view it on the principle set forth in *McQuown* v. *Phaup*, 172 Va. 419, 2 S. E. (2d) 330, and the cases there cited, in which it is briefly stated it is not the duty of the court to pass upon the preponderance of the evidence and he should not set aside a verdict supported by testimony which there is no reason to discredit. Quoting further, which is from *Meade* v. *Saunders*, 151 Va. 636, 144 S. E. 711, cited in the above mentioned case: 'Where it can be seen from the evidence as a whole that the verdict has recorded a finding in plain deviation from right and justice the court may, indeed should, set it aside.' Quoting further: 'We have no rule to tell us when there has been a plain deviation from right and justice. That, within judicial limits, must be measured by the conscience of the court.'

"Even if the court were to look upon and consider the evidence of the witness referred to, in view of all the other facts and circumstances in the case the court thinks any verdict based upon his testimony would be a plain deviation from right and justice."

*Affirmed.*