# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

ESSO STANDARD OIL COMPANY v. GEORGE N. AND
ELIZABETH M. STEWART.

May 1, 1950.

Record No. 3631.

Present, All the Justices.

The opinion states the case.

*Thomas B. Gay* and *H. Merrill Pasco*, for the plaintiff in error.

*Sands, Marks & Sands*, for the defendants in error.

MILLER, J., delivered the opinion of the court.

George N. Stewart and Elizabeth M. Stewart, husband and wife, obtained a verdict and judgment for $300 against Esso Standard Oil Company. It was awarded for damage caused to the furniture, walls and interior of their home on December 16, 1947, by an excessive and injurious accumulation of smoke from the hot water oil burner or furnace. They assert that this was occasioned by the negligence of defendant's employees, who, on December 15, 1947, undertook to check and adjust the furnace to stop it from cutting off and on too frequently.

The parties will be called plaintiffs and defendant in accordance with their positions in the trial court.

■ The primary question presented is whether or not the evidence is sufficient to sustain the verdict. Though approved by the judgment of the trial court, it is our duty to set it aside if it is without evidence to support it or plainly wrong. Section 8-491, Code, 1950, and *McQuown* v. *Phaup,* 172 Va. 419, 2 S. E. (2d) 330, and *Smith* v. *Turner,* 178 Va. 172, 16 S. E. (2d) 370, 136 A. L. R. 1251.

The heating plant, which is interchangeably called a hot water oil burner or hot water furnace, is located in the basement of the residence. The heat or room temperature is regulated and controlled by a thermostat situated on the main floor. The amount of air admitted to the firing chamber of the burner is regulated by an air shutter. The set or angle of this shutter determines the area of space or aperture for the admission of air and thus fixes the volume or amount entering the combustion chamber of the oil burner. That, in turn, materially affects the character and clarity of the flame emanating from the end of the oil jets. If the shutter is closed too tightly or the air aperture otherwise becomes obstructed, smoke will be generated and emitted from the burner. It will also smoke if the shutter is opened too wide and an excessive amount of air admitted.

Defendant had in its employ two experienced and competent oil burner mechanics—Carroll N. Thurston and Enid Clapp. For brevity they will be referred to as "Thurston" and "Clapp."

On December 15, 1947, these two employees were engaged in servicing an oil burner in the home of one of defendant's customers which was located next door to plaintiffs' residence. On that day, plaintiffs' oil burner had been "cutting off and on too frequently" and "wasn't functioning properly." Upon being apprised of the fact that Thurston and Clapp were working upon his neighbor's oil furnace, plaintiff, George N. Stewart, requested them to examine his oil burner. He informed them that it was cutting on and off too frequently and requested that they "check it and put it in good order * * *."

These two mechanics undertook to remedy the trouble. When they departed about 5:00 o'clock p. m., one of the plaintiffs signed a work order for the service that had been rendered. Shortly thereafter the plaintiffs, who were the only occupants of the residence, also left their home for the evening. When they departed the thermostat was set at 55 degrees. The out-door temperature was then 36 degrees and at no time before 7:30 a. m., December 16th, did it rise beyond 39 degrees.

This low temperature throughout the night necessarily caused the burner to operate sufficiently during that time to maintain the temperature of 55 degrees within the residence. The next morning, without changing the thermostat from its 55 degree position, plaintiffs after having breakfast, left their home at 7:30 a. m. and did not return until late afternoon. The out-door temperature rose steadily during the day to attain 55 degrees at 2 and 3 o'clock p. m. At no time from 9:00 o'clock a. m. to 8:00 o'clock p. m. was it lower than 42 degrees. The house remained closed from 5:00 p. m., December 15th, when defendant's employees departed, until plaintiffs left the next morning with the out-door temperature during that fourteen and one-half hours not higher than 38 or 39 degrees without any evidence or odor of smoking being noticed, either when plaintiffs returned late on the evening of December 15th or when they arose and had breakfast on the 16th. However, the testimony of plaintiffs might indicate that there may have been some slight foreign substance in the air at some time during the latter part of the night of December 15th or early morning of December 16th.

When asked if they observed anything unusual, they said no smoke was noticeable either the night of the 15th or the morning of the 16th, but George N. Stewart said that when they awoke on the latter morning they "sort of felt dirt in the throat like you clear your throat and expectorate; it was sort of black and at the time I didn't understand what it was and didn't pay any attention to it." His wife

stated that she noticed no smoke, but that morning "when you cleaned your teeth your sputum was black—that would show black and your nose was black."

This testimony suggesting some foreign substance in the air that morning, if it can be so construed, is of but little probative value. It affirmatively discloses on its face that there was in fact no change in the air or atmosphere noticeable to either the sense of sight or smell and that the discoloration of their sputum to which they now attach importance was so trivial as to then seem unimportant and of no significance.

Upon return to and entering their home on the late afternoon of December 16th, they found an injurious accumulation of smoke throughout the house. It is described as "dense blue smoke and it seemed to be over the whole house." The oil burner was thereupon cut off and defendant promptly notified, but upon its failure to immediately send a mechanic to correct the condition, the services of another company were secured and its employee remedied the trouble. When this mechanic arrived that night, the furnace had been cut off, but upon turning on the electric switch, the oil burner smoked again.

Upon further examination, this mechanic found that the air shutter was almost closed with its set-screw tightly screwed down, which condition held the shutter firmly in this nearly shut position. To remedy the trouble, he released the screw and widened the shutter opening or aperture, thus permitting more air to enter the combustion chamber, whereupon the burner ceased to smoke. This witness also stated that the furnace needed cleaning and that his recollection was that he returned two days later and gave it a vacuum cleaning.

It is conclusively proved and undenied that no manipulation or adjustment of the thermostat can cause the burner to smoke. In that respect, the thermostat has no connection with or effect upon the burner. Even its total disconnection

and removal would not cause the furnace or burner to smoke.

When defendant's mechanics responded to the request that they check and correct the trouble with the oil burner, Clapp went to the basement and Thurston immediately undertook to examine the thermostat. They each emphatically say that they did not adjust, work upon or come in contact with the oil burner itself or the air shutter or any part of the furnace affecting these instrumentalities. That is not in terms denied. Thurston gives this specific and minute account of what they did:

"So I went into the house and Mr. Clapp went down in the basement and I went to the thermostat and pulled the cover off the thermostat and when I pulled the cover off of it the mercury tube and little brace that holds the tube in fell in the floor and I put the thermostat back together and put it back on the wall and went back in the basement and told Mr. Clapp, 'I think I have found the trouble.' I said, 'When the burner starts up you knock on the pipe or holler up and let me know.' I went back up there and turned the thermostat up and the burner started up and he hollered up there and told me—I believe he knocked on the pipe and I tried it about three or four times and the burner done all right and I came on out and Mr. Stewart signed the ticket and we got the tools and came on out * * *."

"Q. Will you state what is the nature of the work performed?

"A. I found the bracket holding the thermometer in the case of the thermostat hitting against the points: that is, just the bracket holding the thermometer had fallen down and hitting the points of the thermostat and keeping the thermostat from working."

His report or service ticket signed by George N. Stewart and turned in to defendant's office likewise disclosed that the trouble was in the thermostat. No mention was made therein of any work upon or adjustment of the air shutter or burner.

Upon entering the basement, Clapp says he opened the door of the furnace as a safety precaution. When told by Thurston that the trouble had been discovered in the thermostat, he likewise says that the tests heretofore described were then made. His denial that he touched or adjusted the burner or shutter is clear and emphatic. It follows:

"Q. Did you do any work on the burner itself?

"A. No, sir.

"Q. Or on the air shutter?

"A. No, sir.

"Q. Where is the air shutter located on that burner?

"A. The burner itself is located behind the boiler and if I am not mistaken the hot water tank and the lines going to the hot water tank are sitting between the burner and the opening of the basement. I would say you would have to get down on all fours to stoop over and under the pipes to get to the burner.

"Q. Standing where you were to open the fire chamber, could you have reached the air shutter from that point?

"A. No, sir.

"Q. Did you get around behind the burner?

"A. No, sir.

"Q. Did you touch the air shutter at any time?

"A. No, sir."

It appears that these two employees were occupied in testing, checking and correcting the trouble in the thermostat for some thirty to sixty minutes. Plaintiffs say that they were in the home about thirty to sixty minutes—Thurston fixes the time at "nearly an hour." He accounts for this period of time, whatever it was, as follows: He says that after he located and corrected the trouble in the thermostat the three or four tests heretofore described to ascertain if the furnace cut on and off properly were made. Each test or performance had to await the regular functioning of the thermostat and burner and the signal from Clapp that the burner had started up, and each test would take four or

five minutes. An additional ten or fifteen minutes was consumed in putting the thermostat back together.

Two other witnesses—experts who were familiar with oil furnaces and the character of burner and air shutter here involved—said that had the shutter been improperly adjusted, the burner would have begun smoking at once. They both agreed that the smoke would have become noticeable in the house within half an hour or maybe less. They also said that smoking may be caused by the accumulation of lint or other foreign matter upon the opening of the air shutter.

Having shown that no one touched the oil burner or any part of the furnace after defendant's employees left the premises until after the damage had occurred and that upon correction of the adjuster on the air shutter, the objectionable condition was remedied, plaintiffs insist that it may be reasonably inferred that Clapp tampered with and misadjusted the shutter. ·

■■ If the condition obtaining and relied upon had been wholly unexplained, we cannot say that it might not have been reasonably inferred from these proved facts that one of defendant's employees adjusted the air shutter which caused the oil burner to smoke and thus brought about the ultimate accumulation of smoke in the premises on the following day. Yet the uncontradicted testimony of Thurston and Clapp, corroborated as it is by that of two expert witnesses, that the burner would have smoked immediately had they misadjusted the shutter, precludes and forbids any such uncertain inference.

Though it seems rather definite that the detrimental accumulation of smoke was due to an inadequate amount or volume of air reaching the fire chamber, that anything the two mechanics did caused such insufficiency of air intake is not disclosed by any direct evidence nor may it be inferred in the face of the uncontradicted facts proved.

To establish the proximate cause of the accumulation of smoke in their home sometime during the day of December

16th, plaintiffs, in the final analysis, rely upon an inference of manual misadjustment of the shutter by one of the mechanics. Here, however, there is no proof that the burner smoked immediately after Thurston and Clapp did their work. All proof is that it did not then smoke, and there is direct, positive and uncontradicted testimony not in conflict with plaintiffs' circumstantial evidence that, if the shutter had been manually misadjusted, smoke would have been noticeable within thirty minutes. Neither the jury nor we are entitled to disregard this uncontradicted and not inherently incredible testimony.

In *Epperson* v. *DeJarnette,* 164 Va. 482, 180 S. E. 412, we find:

"While the jury is the judge of the weight of testimony and the credibility of witnesses, it cannot arbitrarily disregard the uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with other facts and circumstances appearing in the record, even though such witnesses are interested in the results of the litigation." (164 Va. at p. 485.)

Plaintiffs' right to recover depends, not only upon the fact that they proved that an insufficient aperture prevented the intake of enough air to the combustion chamber, but that defendant's servants had actually misadjusted the shutter. Before they can prevail there must be proof of causal connection between what the mechanics did and the damage or injury complained of. Here what these mechanics did, and that they did not touch or make contact with the shutter or burner proper or with any part of the furnace so as to cause it to smoke, is convincingly proved by direct, reasonable and unimpeached evidence, both factual and expert.

Much in point is the decision of *Slaton* v. *Atlantic Gas Light Co.,* 62 Ga. App. 42, 7 S. E. (2d) 769. In that case plaintiff sought to recover damages sustained by the explosion of a gas stove which she asserted was caused by defendant's negligent inspection and repair of the thermostat. Defend-

ant denied that it had repaired the stove as claimed and said it had only installed a valve regulating the top burner and that inspection revealed nothing wrong with the thermostat or oven. Circumstantial evidence was relied on by plaintiff to establish the proximate cause of the mishap. Direct, uncontradicted and poistive evidence was introduced by defendant which was not inconsistent with plaintiff's circumstantial evidence but which was to the effect that defendant had been guilty of no negligence and had done nothing that would have caused the explosion. The court said:

"The sole charge of negligence made against the defendant company was in defectively repairing plaintiff's stove on December 16, 1937, by installing therein a defective thermostat which acts were the proximate cause of her injuries. (62 Ga. App. at p. 45.)

\* \* \* \* \* \* \*

"If the circumstantial evidence testified to by the witnesses of the plaintiff, although true, yet do not contradict the facts positively testified to by the workmen, to-wit: That the workmen were not negligent in repairing and inspecting the stove, the circumstantial evidence of the plaintiff would not be inconsistent with the positive direct testimony of the workmen and it could not be said that the plaintiff had affirmatively shown that the workmen had been guilty of negligence. *Western, etc., Railroad* v. *Gentle,* 58 Ga. App. 282, 297, 198 S. E. 257. 'A fact cannot be established by circumstantial evidence which is perfectly consistent with direct, uncontradicted, reasonable and unimpeached testimony that a fact does not exist.' *Neill* v. *Hill,* 32 Ga. App. 381 (2-b), 123 S. E. 30, 31. 'If the direct evidence established, without dispute, that the defendant was not negligent, the verdict in plaintiff's favor is unlawful, although the defendant had not satisfactorily accounted for the occurrence.' " (62 Ga. App. at p. 47.)

This principle finds approval in the following decisions and text of *Virginia Iron, etc., Co.* v. *Hughes,* 118 Va. 731, 88 S. E. 88; *Southern Ry. Co.* v. *Hall,* 102 Va. 135, 45 S.

E. 867, and 1 Sherman and Redfield on Negligence, sec. 46, p. 122.

To sustain a verdict, the inference sought to be deduced from the facts proved must be one that reason dictates. It must be a permissible deduction from the evidence and not one in contradiction thereof.

Under the facts disclosed, the inference or deduction claimed is necessarily dissipated and removed by the accredited and uncontradicted facts proved.

Though the evidence be viewed in the light most favorable to plaintiffs and all just inferences drawn in their behalf, it is inconclusive. No causal connection between the activity of Thurston and Clapp and the smoking of the oil burner the next day is proved. The evidence leaves the proximate cause of the mishap to speculation and conjecture and is therefore insufficient to sustain a recovery. *Edwards* v. *Hobson*, 189 Va. 948, 54 S. E. (2d) 857.

For the reasons stated, the judgment is reversed and final judgment for defendant will be entered.

*Reversed and final judgment.*