**CITY OF RICHMOND, Appellant,**

v.

**ATLANTIC COMPANY, a corporation organized and existing under the laws of the State of Georgia, trading and doing business in the City of Richmond, Virginia, as Merchants Ice and Cold Storage Company, Appellee.**

No. 7893.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 13, 1959.

Decided Jan. 13, 1960.

John S. Davenport, III, Richmond, Va. (J. E. Drinard, City Atty., John P. McGuire, Jr., Asst. City Atty., George B. Little, William R. Cogar and Denny, Valentine & Davenport, Richmond, Va., on the brief), for appellant.

George R. Humrickhouse, Richmond, Va. (Fielding L. Williams, Louis G. Fields, Jr., Williams, Mullen, Pollard & Rogers, Richmond, Va., Griffin B. Bell, Harry C. Howard, Jr., and Spalding, Sibley, Troutman, Meadow & Smith, Atlanta, Ga., on the brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

The Atlantic Company, doing business in Richmond, Virginia, as Merchants Ice and Cold Storage Company, hereinafter referred to as "Merchants", instituted this action to recover damages resulting from an explosion which occurred in its cold storage warehouse in Richmond shortly after 10:30 on the morning of January 16, 1958. Merchants claimed damages to its real and personal property, for loss of use thereof and, by right of subrogation and assignment, the sum of $25,000 for the death of each of four of its employees who were killed in the explosion, claims having been filed against Merchants under the Workman's Compensation Law of Virginia, Code 1950, § 65–1 et seq. It is charged that the explosion was caused by natural gas which had escaped from a 3-inch gas main owned, operated and maintained by the City of Richmond, hereinafter referred to as "City", in the street adjacent to the warehouse. The jury, by special verdict, awarded Merchants the sum of $251,000 as damages to its real and personal property and loss of use thereof; also the sum of $60,000 on the four death claims. City moved the court to set aside the verdict or, in the alternative, to grant a new trial, which motions were denied. This appeal followed.

Merchant's warehouse, used for storage of produce and other commodities, is located at the northeast corner of the intersection of Fifth and Byrd Streets in the City of Richmond. Fifth Street, on the west side of the building, slopes downwardly toward Byrd Street on the south, and along the southern line of the building Byrd Street slopes downwardly toward Sixth Street on the east. The warehouse is five stories in height, the first story being entirely below, and the second story being partially below, ground surface. There are no entrances to the warehouse from Fifth or Byrd Streets. Access to the building, for receiving and shipping stored merchandise, is gained through an alley passage extending westerly from Sixth Street to a loading platform on the north wall of the building which is flush with the second floor level. On the south side of the building, along Byrd Street and just inside the warehouse, is a railroad siding depressed sufficiently to bring the cars flush with the first floor level.

Originally, the warehouse was designed to maintain temperatures between 35 and 40 degrees Fahrenheit throughout, except in the passageways and on the platform. Subsequently, twelve rooms were converted to "freezer" rooms designed to maintain a temperature of approximately zero degrees Fahrenheit.

The warehouse is equipped with an ammonia refrigeration system of the direct expansion type, operated on the flooded coil principle. Liquid ammonia is introduced into the refrigeration system from three large receiver tanks located in the "engine room", a separate two-story building across Sixth Street from the warehouse. The liquid ammonia is carried across Sixth Street in overhead pipes to the warehouse building, where it enters coils located in the various storage rooms at low pressure and circulates through the coils absorbing heat in the room which changes the ammonia to vapor form. The vapor then flows back through the return line to compressors, condensers and receivers located in the engine room, where it is restored to liquid form.

From the evidence it appears that the explosion occurred in freezer room 22, which is on the second floor of the warehouse, faces Fifth Street, and is the second room north of the Byrd Street side of the building. The north wall of room 22 which was above grade, consisted of an 18-inch thickness of brick. The west wall of room 22, which was partly below ground surface, was an upward extension of the foundation wall and consisted of a 22-inch thickness of concrete. Insulated partition walls separated room 22 from room 24 on the south and the shipping room on the east. The interior surfaces of the walls of room 22 consisted of several layers of cork insulation and plaster, having a total thickness of about eight inches. For three or four months before the explosion that room had been maintained at about zero degrees Fahrenheit.

City gas distribution mains were located in Fifth Street. An 8-inch cast iron low pressure main was located about seven and one-half feet from the west foundation wall of the warehouse, approximately four feet beneath the surface of an unpaved sidewalk area twelve feet wide extending along Fifth Street between the east curb and the west wall of the building. A 3-inch cast iron low pressure main was located about twenty feet from the west wall of the warehouse and approximately four feet below the surface of Fifth Street. The evidence disclosed that this 3-inch main had been laid about one hundred years before the explosion. The pressure of the gas in each of these mains was approximately one-quarter pound per square inch. Fifth Street was originally surfaced with cobblestone over which a composition of asphalt, or tar and gravel, had been placed.

Richmond Sign Company occupied a building on the west side of Fifth Street diagonally across from Merchants and slightly to the north of the warehouse room 22. On November 18, 1957, about two months prior to the explosion, employees of the Sign Company detected an odor in their building which was variously described by witnesses as "dirty gas", "decaying vegetation" and " * * * gas * * *. Because at home you turn those buttons on the stove and that is how I know about the smell of that". Detection of this odor was reported to the City which promptly sent an employee to investigate. Upon arrival of the City employee, the odor was dissipated and although the employee "checked around the meter, around the stuff cock, and on the house line in the house", he could find no evidence of gas.

According to testimony, during December 1957 the odor recurred at the Sign Company building and, upon being notified, the City sent three men to investigate. While the City has no record of this call, a Sign Company employee testified that three men came to the building, one staying outside and two coming inside. This witness stated that, prior to the time of giving notice to the City, the odor would come and go and that sometimes it was "bad", sometimes "mild". He further stated that at the time the three men came, no odor was detected.

During the month preceding the explosion, an odor was detected in room 22 of Merchants. This odor was described by employees and a visiting truck driver as "a clean odor", "like fresh paint" and

"like cheese and butter". There was evidence of a telephone call made by C. R. Gray, Merchant's foreman who was killed in the explosion, to his superior, Chief Engineer B. M. Bolton, in which he told Bolton that he was "having complaints around here from the boys of gas in 22 freezer". Bolton testified that he investigated and the odor did not smell like natural gas; in fact, he did not go there expecting to smell natural gas but thought Gray was referring to a gasoline odor. There were no natural gas lines in the warehouse and, in view of this fact, Bolton's explanation appears to be logical and understandable. No report of this odor was made to the City and it was not asked to investigate.

Shortly before the explosion, B. F. Espy, a plumber seeking work, parked his truck on Fifth Street near the west wall of Merchant's warehouse and, without getting out of his truck, smelled natural gas. For some six hours after the explosion, the only odor present was that of ammonia liberated from Merchant's refrigeration system. At about 4:30 in the afternoon, the west wall of Merchants was pulled down and thereafter, upon detection of a natural gas odor, the City uncovered, cut and plugged the 8-inch main both north and south of the warehouse building, a break being found. However, it was agreed and conceded that this break did not exist prior to the explosion.

In the days following the explosion, tests were made by investigators who had been engaged by Merchants and City to determine the cause of the explosion. Tests were made in and around the warehouse by the use of an Explosimeter a device designed to detect the presence of gas. Such tests within portions of the warehouse were conducted on January 20, 1958, some four days after the explosion. On January 25, 1958, sufficient rubble had been removed from the inside of room 22 to allow Emerson Venable, a gas chemist engaged by Merchants to investigate, to explore for the presence of gas. No gas was found but, according to Venable, he hardly expected to find any trace of gas so long after the explosion. On the same day, from the interior of the building (and into the soil underlying the sidewalk area) he drilled holes through the west wall of room P (which was located directly below room 22) and the west wall of room 24 and received a positive signal of the presence of gas in the soil adjacent to both rooms. On January 18, 1958, two days after the explosion, Alan Lockwood, a gas engineer and consultant, who had been called by the City to investigate, became concerned that the movement of the heavy equipment in clearing the rubble had damaged the 3-inch gas main. Accordingly, he directed that "bar holes" be sunk over the 3-inch main so that tests could be made. These tests disclosed traces of gas of varying intensities, the greatest concentration being at a point in Fifth Street 35 to 40 feet in a southerly direction from room 22. The 3-inch main was uncovered near this point and a circumferential break was disclosed, which break was enclosed in a repair sleeve. Sam Tour, a metallurgist who was engaged by Merchants to investigate, in describing the break in the 3-inch main, expressed the opinion that the break had occurred before the explosion, "at least weeks, probably months, but definitely weeks and weeks * * * since it cracked originally". Witness Venable expressed the opinion that the break existed weeks, or perhaps months, but a minimum of three to four weeks before the explosion. Both experts based their opinions on the presence of "white dirt" around the break, the dryness of the soil and upon the smoothness and roundness of the edge of the break indicating further erosion since the original break. The white dirt is characteristic of earth through which natural gas has passed. According to the testimony of a witness for the City, the white dirt extended six inches on top of the 3-inch main and about three inches to each side of it, and it was this testimony which was relied upon, in part, by the experts in forming their opinions. Following the repair of the break in the 3-inch main on January

18, further tests disclosed higher concentrations of gas and the 3-inch main was then cut and capped at Byrd and Canal Streets. Examination upon subsequent excavation of the 3-inch main did not disclose any additional breaks or leaks.

On January 28 and 29, the 8-inch main was excavated thus exposing the entire west walls of rooms 22 and 24. The only "white dirt" was that found in the near vicinity of the break in the 8-inch main but it did not extend to the warehouse. A place in the wall of the warehouse described as a "hole" or a "crack" was found. The evidence indicated that on the outside of the wall a hole, caused by a board which had been used in the concrete forms and left there, extended into the wall some six inches and from that point there was a crack through which an engineering expert, Jerry A. Burke, Jr., engaged by Merchants, found he could blow smoke.

On February 18 and 19, the 3-inch main was excavated and the repair clamp or sleeve that had been applied to the break on January 18 was removed. The excavation disclosed a downward curvature of the 3-inch main beginning approximately 17 feet south of the break and extending some 20 to 25 feet southward. This curvature was described by Merchant's witnesses as a "sag" and by the witnesses for the City as a "drip". The main at that location consisted of several short lengths of pipe joined by solid sleeves. Witnesses for the City testified that this is the way a drip would be constructed; that a drip is a low place, intentionally formed in the line, into which the condensation on the interior of the line will drain and escape without hampering the flow of the gas. Other witnesses testified that "sheathing" or "cribbing" had previously been used along this main in the area of the sag. The purpose of sheathing is to support unstable soil during an excavation, so it is claimed. Near the low point of the curvature, a pipe was found attached to the 3-inch main. One witness described it as being directly at the bottom of the 3-inch main, while others who tes-

tified on this point placed it in the lower quarter of the pipe. Witness Funkhouser testified that the pipe attached to the 3-inch main would not come out so they broke it off. Merchants, on the other hand, contends that the curvature was not a drip but was simply a sag which resulted from the installation of the pipe in unstable soil. Witness Burke testified that the soil at this point was "mucky", indicating that the pipe was laid over an old stream bed. A map of 1809 showed the existence of a stream in that area but the evidence was not conclusive as to its exact location and the stream may have been somewhere between the north point of the curvature and a point some 60 feet farther south. Merchants further contends that the pipe extending from the 3-inch main was a "service connection" and not a drip pipe because (1) the pipe was found at the side rather than the bottom of the 3-inch main, and (2) the threads used in the connection were not developed until 1882, some 28 to 30 years after the pipe was conceded to have been installed. Unfortunately, no records on these points were available. After the 3-inch main was excavated, witness Tour performed tests on a portion of it and stated his opinion that the "pipe was in a deplorable condition" and that the break resulted from "old age deterioration of the pipe and sagging of the pipeline".

In neither the complaint nor amended complaint are specific acts of negligence alleged. It is simply charged that the explosion occurred by reason of the fact that the City negligently permitted gas to escape from its lines into the warehouse. The case was apparently tried, briefed and argued by Merchants on the theory that the City was negligent in certain particulars which will be later noted, developed and discussed. The City defended on the theory (1) that the explosion was not due to natural gas but to ammonia gas escaping in the warehouse from Merchant's refrigeration system, and (2) that, if natural gas did cause the explosion, Merchants was guilty of contributory negligence in failing to report

to the City the suspected presence of natural gas in the warehouse.

 The court charged the jury in part as follows: " * * * As you will readily realize, natural gas, like electricity, is a dangerous instrumentality and, therefore, to exercise reasonable care in the handling of it requires a greater degree of care than would be required if it were not in itself a dangerous instrumentality." While we find no Virginia case which characterizes natural gas as a dangerous instrumentality, the Supreme Court of Appeals of Virginia has held electricity to be a dangerous instrumentality and has said, in effect, that one using a dangerous instrumentality is charged with the duty of exercising a "high degree" of care. Andrews v. Appalachian Elec. Power Co., 1951, 192 Va. 150, 63 S.E.2d 750; Jeffress v. Virginia Ry. & Power Co., 1920, 127 Va. 694, 104 S.E. 393. No objection was made by the City to that portion of the court's charge, which we approve as in accord with the general rule stated in 38 C.J.S. Gas § 42, at page 732 (1943).

### Cause of Explosion, Evidence

City contends that the evidence offered by Merchants was insufficient to show that the explosion was caused by natural gas. Reliance is placed upon such cases as Ralston Purina Co. v. Edmunds, 4 Cir., 1957, 241 F.2d 164, 168; Hall v. Payne, 1949, 189 Va. 140, 147, 52 S.E.2d 76, 79; and Chesapeake & Ohio Ry. v. Catlett, 1917, 122 Va. 232, 94 S.E. 934, to support its contention. The rule as stated in the Ralston Purina case is as follows:

"It is not sufficient to show a set of circumstances bringing the theory of appellants within the realm of possibilities, nor can the theory itself furnish the deficiency; the evidence must bring the theory to the level and dignity of a probable cause * * *.

"Evidence which shows a 'probability' and not a mere 'possibility' is especially necessary in a case such as this, where expert testimony is heavily relied upon to prove that one event was the proximate cause of another * * *."

That City natural gas *could* have entered the warehouse is shown by testimony that gas escaped from a break in the 3-inch main which had existed for some time before the explosion; that liberated natural gas will move below the ground surface and follow the path of least resistance; and, that natural gas will penetrate concrete and brick surfaces because of their porosity.

 There was evidence before the jury tending to show that most probably the natural gas *did* enter the warehouse, and *did* cause the explosion. It is not necessary that the experts discover natural gas actually flowing from the break in the 3-inch main into the warehouse. Under the test laid down in the Ralston Purina, Hall and Catlett cases cited supra, it is sufficient if the evidence indicates that the theory offered by Merchants is sound and is the one most probable under the circumstances.

Aside from the testimony as to the age of the break in the 3-inch main, there was testimony from Espy, an unemployed plumber who had worked with gas lines, that about an hour before the explosion he detected the strong odor of natural gas near the west wall of Merchant's warehouse. Since it was conceded that the 8-inch main was not broken before the explosion, it could be logically concluded that the gas detected by Espy came from the only proven break in the 3-inch main. After the explosion, while no gas was detected in the warehouse or in its walls, witness Venable did determine the presence of gas in the soil outside the wall of room 24 situated on the same floor and beside room 22, and outside the wall of room P, directly below room 22. The explanation of the absence of gas inside the warehouse at the times of inspection following the explosion was quite logical since the walls had been demolished.

Witness Burke, in explaining his reasons for concluding that the gas found outside the west wall of the warehouse

adjacent to room 24 and room P was from the 3-inch main, stated, in substance and effect, that the gas from the 3-inch main traveled in a northeasterly direction along the building wall to a point adjacent to room P; that gas from the 8-inch main had not traveled in a southerly direction far enough to meet the gas that had spread from the 3-inch main, and there was a definite "discontinuity" between the points where the presence of gas from the 8-inch main and of gas from the 3-inch main was indicated; that there was no indication of gas along the wall adjacent to the break in the 8-inch main. Thus, he explained, since he was able to trace the path of the gas from the 3-inch main to a stated location, and was unable to trace the gas from the break in the 8-inch main that far south, he concluded that the gas detected in the soil outside rooms 24 and P was from the 3-inch main.

In explaining the probable path of the gas and why it had not escaped to and through the surface of the ground, both Burke and Venable pointed out that the ground was frozen for a time before the explosion and that the frozen soil acted as a lid to keep the gas in the ground. Further, these witnesses testified that even if the ground were not frozen, prevailing atmospheric conditions creating greater air pressures would tend to keep the gas compressed in the ground and the gas would tend to move laterally. That some gas did escape from the surface of the ground in close proximity to the warehouse is indicated by the testimony of Espy who smelled gas before the explosion.

According to the testimony, the gas, upon reaching the warehouse, would encounter no difficulty in entering through the porous brick and concrete surfaces. Once inside the masonry walls, the gas would circulate through the spaces and pores in the cork insulation and eventually find its way in and through the plastered surface of the interior walls of the rooms.

City offered the testimony of B. S. Williams, Executive Vice President of High-Press Airconditioning of America, and W. F. Friend, an employee of Ebasco Services, Incorporated, of New York City, a consulting firm, to show that the explosion was caused by gasses which escaped from the ammonia refrigeration system. The substance of their testimony was that freezing in the ammonia lines caused certain of the pipe supports to break, thus placing added weight on the lines which, upon losing their support, angled sharply downward causing a jolt to the accumulator which was sufficient to break the weld securing the accumulator leg. The result was a boiler type explosion caused by the instant escape of a large quantity of ammonia liquid and vapor. Friend testified that the energy required to ignite the combustible matter was little different than that required to ignite a mixture of natural gas and air. He expressed the opinion that the burns on C. R. Gray, the foreman who was in room 22 at the time of the explosion, were caused when this ammonia mixture was ignited. Ignition is variously attributed to electricity or to the lighting of a match by Mr. Gray and, in view of the burns on Mr. Gray's hands, arms, upper chest and head, the jury could have concluded that the latter was the more probable.

Merchant's expert witnesses, Venable and Burke, gave as their opinion that the explosion was caused by the ignition of natural gas. The substance of their testimony was that ammonia of sufficient concentration to cause explosion could not have been present in the room before the explosion. They stated that, under any circumstances, a concentration of ammonia of 16 to 25 or 26 per cent by volume would have been required to be explosive, and that a concentration of one to three per cent in the air will blister the human body. Therefore, they theorize that had an explosive concentration of ammonia been present in the room at the time C. R. Gray entered, his entire body would have been badly blistered. The medical examiner, Dr. Mann, testified that the burns on Gray were not identifiable as ammonia burns and that

an examination of the lungs and interior organs disclosed no trace of ammonia internally. This medical finding indicated to the experts that breathing stopped before any ammonia reached Mr. Gray.

Witness Burke, in stating his reason for his conclusion that the explosion resulted from natural gas and not from ammonia, explained that it was a high pressure explosion caused by a gas which is instantly ignitible and burns rapidly. He stated first that ammonia ignites with much more difficulty than does natural gas and that once it is ignited it burns slowly and sluggishly. Therefore, the pressure resulting from the burning of ammonia builds up rather slowly so that the weakest places in the structure would be the first to go. However, in this explosion the room appeared to have been blown up all at once, indicating to him the presence of a fast-burning gas such as natural gas, which burns ten times more rapidly than ammonia. Witnesses further testified that they had ruled out all possibilities other than natural gas and ammonia and, for the reasons stated, did not believe ammonia to be the culprit.

■■ Thus, the jury had before it two conflicting theories as to the cause of the explosion and it chose to accept the one favorable to Merchants. The general rule requires that the evidence must generate an actual rational belief in the existence of a disputed fact, and that evidence which leaves the issue to surmise or conjecture, leaving the minds of the jurors in equipoise, is never sufficient to sustain a verdict. Hall v. Payne, supra; Laurent v. United Fuel Gas Co., 1926, 101 W.Va. 499, 133 S.E. 116. In Burk v. Huntington Dev. & Gas Co., 1950, 133 W.Va. 817, 58 S.E.2d 574, 582, the Supreme Court of West Virginia, quoting from one of its earlier decisions, held:

> "In an action for tort, the plaintiff bearing the burden of proof, a verdict for him cannot be found on evidence which affords mere conjecture that the liability exists, and leaves the minds of jurors in equipoise and reasonable doubt. The evidence must generate an actual rational belief in the existence of the disputed fact.

> "Where a liability is asserted on the ground of tort, the plaintiff bears the burden of proof of the fact on which the liability rests, and the burden to disprove such fact does not shift to the shoulders of the defendant until plaintiff's evidence shows a state of facts sufficient to establish a rational belief of the existence of such fact."

Considering the evidence of physical facts, opinion evidence of the expert witnesses, the testimony that natural gas was present in the vicinity of the west wall of the warehouse just prior to the explosion, the inferences and conclusions to be drawn from medical testimony, a question for jury determination was presented. We are of the opinion that the evidence was legally sufficient to generate and support an actual rational belief that natural gas was the cause of the explosion and was sufficient to bring Merchant's theory to the level and dignity of a probable cause. We cannot disregard but must accept the jury's determination. McCracken v. Richmond, Fredericksburg & Potomac R. R., 4 Cir., 1957, 240 F.2d 484, 488.

### Sag or Curvature in 3-Inch Main

■■ Merchants alleges that the 3-inch main was improperly and negligently laid in unstable soil. In support of its contention that there is no evidence to sustain this charge, City argues that there is *uncontradicted* evidence that the curvature in the line was a "drip" and that circumstantial evidence inconsistent with such direct evidence cannot be considered. In support of this contention, City cites Esso Standard Oil Co. v. Stewart, 1950, 190 Va. 949, 59 S.E.2d 67, 18 A.L.R.2d 1319 and Slaton v. Atlanta Gas Light Co., 1940, 62 Ga.App. 42, 7 S.E.2d 769.

The so-called "uncontradicted evidence" that the curvature was a "drip" was offered by the witnesses Lordley, Funkhouser and Lockwood. The substance of their testimony was that

"drips" *were* placed in gas lines in the City of Richmond and *were* installed in a manner similar to the curvature in the 3-inch main; that service connections were always made on the top of the main; and that, since the pipe extending from the 3-inch main was on the bottom or in the lower quarter of the main, it must have been a "drip". Merchants produced witnesses who testified that a stream had once passed through this area; that the soil underlying the curvature was "mucky"; that a drip pipe, to be effective, must be located at the bottom of the main; that the surface of the street over the curvature had sunk and had to be filled in over the cobblestone; that the presence of "sheathing" or "cribbing" along the main indicated unstable soil in that area; and that the break in the line resulted from a combination of deterioration of the pipe, due to its age, and the sagging of the line in the unstable soil. Unfortunately, no one could testify positively that this curvature was intentionally formed for "drip" purposes because there were no records of such an installation and apparently no one traced the pipe that was broken off in the ditch to determine exactly what it was. Thus, there was evidence from which the jury might find that the soil in the area of the sag or curvature was unstable.[1] The evidence offered by the City was merely circumstantial and for the jury to consider and weigh together with the evidence offered by Merchants.

### Notice to City of Break in 3-Inch Main

Merchants contends that the City was negligent in failing to take proper steps to discover and repair the source of leaking gas detected in the area and reported to it before the explosion. City counters by claiming that the evidence offered by Merchants was not sufficient to show even constructive notice of a break in the line.

The evidence offered by Merchants was the testimony of the employees of the Sign Company who had reported to the City on two separate occasions that they detected an odor which one or more of them thought was the odor of natural gas. While the odor was variously described, we are of the opinion that the evidence was such as to warrant a finding by the jury that the employees did, in fact, smell natural gas. Witness Burke expressed the opinion that the gas escaping from the break in the 3-inch main worked its way to the Sign Company building through a 24-inch brick drainage sewer and the loosely packed dirt around the sewer wall. The movement of escaped gas through the sewer toward the Sign Company building would be affected by the flow of drainage water in the sewer. This sewer passed beneath the Sign Company building and extended in a southeasterly direction, crossing Fifth Street in the vicinity of the break in the 3-inch main. Burke further stated that the Sign Company building was well ventilated by cracks in the doors, windows and other openings and, for this reason, the odor was not detectable at all times. There was evidence that the City injects into its gas a mercaptan which causes a distinctive "skunk" odor, helpful in detecting escaping gas. According to witness Venable, this odor is not quite the same to all people.

In response to the first call on November 18, 1957, a City employee came and smelled for gas, testing the meter and house lines for leaks by applying a preparation known as Leak-Tex. No evidence of leaking gas was found on that occasion. If the November call had been the only report, the inspection may well have been considered adequate since the City may not be expected to exhaust all possible inspection procedures where the

---

1. To sustain the verdict, it was not necessary that the jury find that the 3-inch main was *originally* negligently laid in unstable soil. The evidence as to the subsidence of the street surface and underlying supporting soil in the particular area of the sag or curvature in the line, together with other evidence in the case, could properly be considered by the jury in determining whether the City failed to exercise the required high degree of care with respect to inspection and maintenance of its lines.

presence of gas is not indicated. However, in view of the second call made in December 1957, from the same location, we are of the opinion that something more was required.

The only evidence as to the visit by City employees pursuant to the December call is that one remained outside and two went into the Sign Company building. There is no evidence as to what they did and the witness who testified as to their presence stated that by the time they arrived, the odor was no longer detectable. Despite the fact that there was no odor detectable at the time of this visit, we believe that City would be bound to recognize the greater possibility that there was a defect somewhere in its lines since the earlier check of the house lines and meter disclosed nothing unusual, and since this was the second call from the same premises. The City was bound to know that its gas mains ran in front of the building, that the cast iron piping was very old, that a brick drainage sewer under the Sign Company building came in close proximity to the 3-inch main, and that, considering the physical properties of gas, it was possible that gas was leaking from one of the mains and was circulating beneath the ground surface. This knowledge, coupled with the imputed knowledge which the City had, or should have had, from the sinking of the street surface, that the soil was somewhat unstable, would impose upon the City the duty to make more exhaustive tests.

■ City contends that even though a safety survey (with the use of an Explosimeter, testing openings in the street such as manholes and water meter boxes) or a bar hole inspection had been made, there is no evidence that the 3-inch main was leaking at the time of the first call from the Sign Company on November 18, 1957, and, therefore, no indication of the presence of gas would have been found. The jury may have found it difficult to agree with this contention. Witnesses Tour and Venable testified as to the age of the break and, from their testimony, the jury would have been jus-

tified in finding that the break did exist as of November 18. Even more clearly, the testimony of these expert witnesses would support a finding that the leak existed in December, at the time of the second call to the Sign Company.

## Inspection and Maintenance

It is charged that the City was negligent in failing to diligently and properly inspect the 3-inch main under all the circumstances which were known, or should have been known, to City, including (a) the nature and condition of the soil in which the pipe was laid; (b) the age and condition of the pipe; (c) the actual sagging of the soil in that particular area as indicated by the depression of the street surface; and (d) the nature of the general area in which the pipe was located.

The evidence disclosed that City, through its employees or through outside assistance, followed the inspection practices set forth in the American Standards Association Code for Pressure Piping. This Code recommends, depending upon local conditions, that a survey should be made in "business districts" at least once a year and at least every five years in outlying areas. Lockwood, an engineering consultant, testified that the words, "business districts", mean areas where solid pavement and sidewalks seal up the entire surface from one side of the street to the other.

The Code recommends that gas detector surveys be used in the business districts by using an Explosimeter and testing of openings in the street, such as manholes and water meter boxes. For outlying areas, the Code recommends using what is known as the "vegetation survey" where an experienced man rides in the back of a slowly moving vehicle and observes the vegetation along the street for signs of deadness or discoloration which would indicate the presence of gas. If the vegetation appears to be dead, the inspector conducts a bar hole test survey whereby a series of bar holes are sunk and an Explosimeter is used to locate any break or leak in the line.

Witness Hinkley, who conducted gas leakage tests for the City, testified that the vegetation survey is "not good" in the winter because most of the vegetation is already dead. Witness Lordley, Assistant Director of the Department of Public Utilities, however, testified that the vegetation survey could be used in the winter because gas causes grass to turn black while, if it is dead from natural causes, it will be brown; further, that even in the winter, some green vegetation can be found growing in and around dead grass.

The evidence indicates that City did not consider Fifth Street a part of the "business district" even though that portion of Fifth Street here involved contained nothing but business houses and some vacant lots. Lordley testified that a vegetation survey was conducted in this area every year but no records were presented as proof of such survey. Hinkley, who conducted these surveys, testified that he made a safety survey (business districts) beginning December 5, 1957, and, following the completion of that survey, conducted a vegetation survey. He at no time stated that such vegetation survey encompassed the Fifth Street area. It is true that Fifth Street was not totally covered by street surfacing and sidewalks and since there was some vegetation in the area, it is argued that the City, by the use of the vegetation survey, was discharging its duty to inspect and such survey would be adequate under the Code's recommendations.

Considering the testimony of expert witnesses that the break in the 3-inch main occurred at least three to four weeks prior to the explosion, the testimony of Hinkley himself that a vegetation survey was "not good" in winter, and the testimony as to indications of escaping gas in the area, the jury would have been justified in finding that no inspection was made in the Fifth Street area and that, even if an inspection was made, it was inadequate and the inspection method was defective. Our statements in this connection are not to be construed as criticism of the recommended procedures provided in the

American Standards Association Code. The Code specifically states that its recommendations are made subject to local conditions. Here local conditions dictated a more thorough inspection than a vegetation survey in the Fifth Street area, and City, in charge of the handling, transportation and distribution of a dangerous instrumentality, would be charged with knowledge of any conditions shown by the evidence to be existing.

We agree with City that it has no duty to replace or to excavate and inspect its gas mains simply because they are over one hundred years old. Such was the decision in Smith v. City of Richmond, 1945, 184 Va. 40, 34 S.E.2d 371. We note also the rule stated in Jeffress v. Virginia Ry. & Power Co., supra, and Virginia Stage Lines v. Newcomb, 1948, 187 Va. 677, 47 S.E.2d 446, that if there is uncontradicted evidence as to the existence of a general usage in the particular trade or business, and nothing to show that such usage is not reasonably safe under the circumstances, then the established usage itself is conclusive evidence of the exercise of ordinary care. Thomas Wolfe, Managing Director of the Cast Iron Research Association and a professional engineer, testified that some fifty-eight gas companies continue to use pipe over one hundred years old and they do not excavate and inspect it or replace it for that reason alone. However, City cannot be heard to say that the duty to inspect and replace never arises until something goes wrong or that, in the exercise of due diligence, it had no knowledge of the sagging of the surface of Fifth Street, no knowledge of the probable instability of the underlying soil in which the 3-inch main was buried and the probability of further sagging which would place greater strain on the old pipe. Under such circumstances, the usage in the trade was not to be safely relied upon and a duty arose to take extra precaution. In this instance, such extra precaution would have entailed merely the inspection of the 3-inch main in the area where the street was known to have sunk by using

either the safety survey method or the bar hole test method.

### Contributory Negligence

City contends further that Merchants is barred from recovery because it was guilty of contributory negligence in that its employees failed to notify City after they suspected the presence of gas in room 22. It is urged that under the rule stated in Brown v. Damron, 1955, 197 Va. 309, 89 S.E.2d 54, the issue of contributory negligence should have been decided as a matter of law by the court and should not have been submitted to the jury since fair minded men could draw but one inference from the facts. The "facts" upon which the City relies are derived from the testimony of Bolton, Raphael Gaskin, a truck driver, and Marshall Jackson, a former employee of Merchants. Their testimony indicated that they had detected a peculiar odor in room 22, but none of these parties identified the odor as that of natural gas. City cites Smith v. City of Richmond, supra, wherein the court said [180 Va. 40, 34 S.E.2d 374]:

" * * * while the court does not now undertake to pass upon contributory negligence of the plaintiff as a matter of law, there is and would be a serious question presented as to whether the plaintiff's own conduct or lack of precaution after she had ascertained gas was in the apartment would not bar her from recovery * * *."

In that case, plaintiff had often noticed an odor which she thought was attributable to a chemical plant in the vicinity, but natural gas was used in her apartment.

■■■ In the instant case, natural gas had not been installed and was not being used in Merchant's warehouse. Thus, there was no reason to suspect the escape of natural gas from within the premises. Without knowledge or suspicion of the presence of *natural* gas, no duty would devolve upon Merchants to notify City. The District Court properly submitted to the jury, for its determination, the question of whether Merchant's agents and employees knew, or should have known, that the odor was that of natural gas. Furthermore, it is our opinion that the evidence asserted as proof of contributory negligence would warrant a jury determination that the employees of Merchants did not know, and were not bound to know, that the odor which they detected was that of natural gas.

The court charged the jury that there was "no evidence that the deceased employees for whom the plaintiff sues were negligent". This instruction pertained to the claim of Merchants as subrogee and assignee of the unlawful death claims of four of its employees killed in the explosion. City urges that the court erred in so charging the jury and that such instruction constituted, in effect, a peremptory charge in favor of Merchants on the issue of contributory negligence. It is argued that if the employees who were suspicious of the detected odors were guilty of no negligence with respect to the claims for damages for their unlawful deaths, the jury would not seriously consider Merchant's contributory negligence which was dependent upon the suspicions of these employees. We believe this contention to be without merit.

■■■ The court, in its charge, clearly pointed out to the jury that the lack of evidence of contributory negligence on the part of Merchant's employees would not preclude a finding of contributory negligence on the part of Merchants itself in failing to notify the City if it had notice and knowledge of the presence of natural gas within the building. The following question was propounded to the jury as a special interrogatory: "Does a preponderance of the evidence show that the plaintiff, * * * Merchants Ice & Cold Storage Company, was negligent in any way that efficiently contributed to the cause of the explosion?" The jury did address an inquiry to the court as to the meaning of the phrase "efficiently contributed". The court explained that this simply meant that contributory negligence must have some

bearing on the result and must be more than slight or insignificant negligence. Since the jurors made no further inquiry, it must be assumed that they understood.

At the close of Merchant's case, City moved for a directed verdict and the court, in commenting upon the evidence of the actions of Merchant's employees after detecting the unusual odor, said: "That evidence showed, rather, did it not, diligence on their part which would negative any idea or any accusation of contributory negligence on their part?" It is well settled that it is the duty of every person to use ordinary care to insure his own safety, and "ordinary care is such care as an ordinarily prudent person would exercise under the same or similar circumstances to avoid injury". 65 C.J.S. Negligence § 118(b) (1950). C. R. Gray and C. W. Gray, who were, respectively, the Foreman and Assistant Foreman of Merchants, reported their suspicions to Bolton, their superior. So far as disclosed by the evidence, they did not suspect the presence of *natural* gas. In these circumstances, there would be no duty on their part to report directly to the City or to take any drastic action, such as quitting their jobs and vacating the premises, even if they knew that a report of the presence of strange odors was not made to the City by their superiors. In fact, City did not, at any time, in defending against the unlawful death claims, raise an issue of contributory negligence on the part of the employees who lost their lives in the explosion. We perceive no error in the court's charge with respect to contributory negligence.

### Court's Refusal to Charge as Requested

City contends that the court erred in refusing to give certain instructions as requested. Without setting forth these instructions in detail, it is sufficient to say that we are of the opinion that the court's charge adequately and fairly instructed the jury on all phases and particulars of the case. The court charged the jury that the mere occurrence of an explosion was not proof of negligence but was a fact to be considered in determining negligence. This is consistent with the general rule expressed in 38 Am.Jur. Negligence § 290, at 985 (1941), as follows:

"* * * While it is true that simply because an accident has occurred, negligence is not to be presumed, still, in determining the question of negligence, the fact that an accident has occurred may be and should be taken into consideration, in connection with all other facts and circumstances of the case, for the purpose of determining whether in fact there was negligence. Negligence may be inferred from circumstances surrounding the injury, if not from the fact of injury itself. * * *"

Similarly, the court's charge with respect to constructive notice to the City of the leak in the 3-inch main is supported by the evidence which has been discussed. The evidence as to the detection of odors in the Sign Company building, as to the location and nature of the drainage sewer, and the reports to the City, considered with the evidence as to the detection of the odor of natural gas outside the warehouse shortly before the explosion, and the evidence of the presence of gas in the soil adjacent to the warehouse, all form a strong chain of circumstantial evidence from which the jury, under the court's charge, could infer and find that the gas came from the break in the 3-inch main. The substance of the City's proposed instructions was encompassed in the court's charge and the City has no basis for complaint. "A party has no vested interest in any particular form of instructions; even though his proffered prayer is unobjectionable in itself, the language of the instructions is for the trial court to determine." 5 Moore, Federal Practice, ¶ 51.06 (2d Ed. 1951).

### Alleged Compromise Verdict

The last contention of the City is that a new trial should be granted because the verdict as to the amount of property damages awarded to Merchants shows on its

face that it represented a compromise of one or more of the basic issues in the case, other than damages. The amount claimed by Merchants was $502,389.22 and a verdict for $251,000.00 was returned by the jury.

As is pointed out in Southern Ry. v. Madden, 4 Cir., 1956, 235 F.2d 198, 204, the decision on a motion for a new trial rests within the sound discretion of the trial court but such discretion must not be arbitrarily exercised. There the first jury trial resulted in a verdict of $5,000.00 and the second trial, on the issue of damages alone, resulted in a verdict of $75,000.00. Speaking through Chief Judge Parker, this court said that such a verdict in the first instance "was not merely totally inadequate but could have been rendered only as a sympathy or compromise verdict and could not reasonably have been rendered if the jury had found real liability on the part of defendant". Similarly, in Schuerholz v. Roach, 4 Cir., 1932, 58 F.2d 32, the sum of $625.00 was held grossly inadequate for the loss of an eye. The court said that the verdict on its face indicated that it represented a difference of opinion among the jurors as to the defendant's liability and was merely a compromise at the expense of both litigants.

City argues that the fact that the verdict amounted to approximately one-half of the sum sued for should be construed by the court as evidence of compromise *on the liability issue*. At the direction of the court, the items of specific damage were enumerated by the jury and an examination of these items indicates that it is misleading to speak of the verdict as representing one-half of the sum sought. In some instances, the jury found damages nearly equal to the amounts claimed, while in other instances the sum granted was far less than one-half of the sum requested. There is always a presumption in favor of the validity of a verdict if it is the result of honest judgment. Brunswick-Balke-Collender Co. v. Foster Boat Co., 6 Cir., 1944, 141 F.2d 882. That this verdict was the result of honest judgment is further supported by the fact that the jury was required by the court to answer specific questions regarding causation, negligence of City and contributory negligence of Merchants before the question of damages was reached. The answers to these questions are consistent with the verdict rendered. Had there existed any doubt as to the honesty of the answers, a poll of the jurors could have been requested when the answers and verdict were returned.

The trial judge is charged with error in overruling City's motion to set aside the verdict and enter judgment in accordance with its motion for a directed verdict made at the conclusion of the evidence, or, in the alternative, to set aside the jury's verdict and grant a new trial. This court has spoken so frequently concerning the duty of the trial judge in passing upon a motion for a directed verdict and a motion to set aside a verdict and grant a new trial, and the standards to be applied, there can be no doubt about the rule.

"Where there is substantial evidence in support of plaintiff's case, the judge may not direct a verdict against him, even though he may not believe his evidence or may think that the weight of the evidence is on the other side; for, under the constitutional guaranty of trial by jury, it is for the jury to weigh the evidence and pass upon its credibility. He may, however, set aside a verdict supported by substantial evidence where in his opinion it is contrary to the clear weight of the evidence, or is based upon evidence which is false; for, even though the evidence be sufficient to preclude the direction of a verdict, it is still his duty to exercise his power over the proceedings before him to prevent a miscarriage of justice. * * * It is equally well settled, however, that the granting or refusing of a new trial is a matter resting in the sound discretion of the trial judge, and that his action thereon is not review-

able upon appeal, save in the most exceptional circumstances."

Aetna Cas. & Sur. Co. v. Yeatts, 4 Cir., 1941, 122 F.2d 350, 354. For further discussion see McCracken v. Richmond, Fredericksburg & Potomac R. R., 4 Cir., 1957, 240 F.2d 484, 488; Williams v. Nichols, 4 Cir., 1959, 266 F.2d 389, 391, 392, 393.

We perceive no error below in the submission of the case to the jury with proper and careful instruction, and we find no abuse of discretion in overruling the motion to set aside the verdict and grant a new trial.

Affirmed.